WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jude Dodson, et al., | No. CV-15-00674-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Cartwright Elementary School District, et al., | |
| Defendants. | |

Before the Court is Defendants Cartwright Elementary School District (the "District") and Officer Sue Doe's motion to dismiss Plaintiffs' federal claims. (Doc. 18.) The motion is fully briefed, and neither party requested oral argument. For the following reasons, Defendants' motion is granted.

## BACKGROUND

Plaintiffs Jude and Byron Dodson bring this action on behalf of their minor child, B.D., a special needs student, against the District and Officer Sue, the school resource officer, for violation of 42 U.S.C. § 1983 and retaliation in violation of the Americans with Disabilities Act ("ADA"). (Doc. 16, ¶¶ 1-10.) Plaintiffs allege B.D. was subjected to undue harassment, bullying, and taunting for several months by both peers and school staff while attending school in the District. Plaintiffs allege the District and Officer Sue knew about the incidents, but failed to take adequate steps to remedy the situation.

The alleged harassment and bullying spanned approximately twenty months, from

August 2012 to April 2014. Plaintiffs describe several incidents of bullying, including derogatory name-calling by classmates, physical altercations between B.D. and fellow students, school staff accusing B.D. of faking illness, Officer Sue arresting B.D. at school, and Principal Winters tackling B.D. during a fight. (*Id.*, ¶¶ 20-168.) As a result of these incidents, Plaintiffs filed a complaint with the Office of Civil Rights ("OCR") on April 22, 2013, alleging discrimination on the basis of disability, race, and gender by the District. (*Id.*, ¶¶ 20-94.) On November 4, 2013, the District entered into a voluntary resolution agreement with OCR to resolve the complaint, which required the District to turn over its policies and procedures to OCR for review. (*Id.*, ¶¶ 96-98.) On March 20, 2014, OCR sent notice to the District's Superintendent that the District's policies did not satisfy the resolution agreement. (Doc. 16-1 at 35.)

In July 2014, while resolution of the complaint was pending, B.D. transferred to another school. (Doc. 16, ¶ 178.) In October 2014, Plaintiffs served a Notice of Claim on the Superintendent of Cartwright School District. (Doc. 16-1 at 1-6.) On April 15, 2015, OCR submitted a letter addressing Plaintiffs' Notice of Claim, which concluded that there was insufficient evidence of discrimination or retaliation. (Doc. 18-1 at 1, 4.) This lawsuit followed. Defendants now move to dismiss Plaintiffs' federal claims.

## **LEGAL STANDARD**

To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The task when ruling on a motion to dismiss "is to evaluate whether the claims alleged [plausibly] can be asserted as a matter of law." *See Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When analyzing the sufficiency of a complaint, the well-pled factual allegations are taken as true and construed in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Iqbal*, 556 U.S. at 680, and

therefore are insufficient to defeat a motion to dismiss for failure to state a claim, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2008).

## ANALYSIS

Plaintiffs' complaint alleges six counts: (1) violation of 42 U.S.C. § 1983, (2) retaliation in violation of the ADA, (3) retaliation in violation of § 504 of the Rehabilitation Act, (4) negligent failure to train, (5) negligent failure to train/supervise, and (6) negligence per se. (Doc. 16.) Defendants move to dismiss only the federal claims: counts one, two, and three.

**I. Section 1983 Claim**

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must [allege] that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Section 1983 'is not itself a source of substantive rights,' but instead provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)). "It is well settled that section 1983 'imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.'" *Johnson v. Barker*, 799 F.2d 1396, 1399 (9th Cir. 1986) (quoting *Baker*, 443 U.S. at 146).

Here, Plaintiffs invoke the substantive component of the Due Process Clause of the Fourteenth Amendment, arguing that Defendants deprived B.D. of the right to be free from bodily harm while under the District's supervision. It is this alleged constitutional deprivation for which they seek damages under § 1983. Defendants are alleged to have been acting under color of state law. The only issue is whether Plaintiffs have plausibly alleged that Defendants deprived B.D. of a constitutional right.

Generally, the Due Process Clause does not impose a duty on the state to "protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Social Services*, 489 U.S. 189, 195 (1989). "[A] State's

failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. However, two important exceptions to the general rule exist: (1) when there is a "special relationship" between the plaintiff and the state (the "special relationship exception"), and (2) when the state "affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger,'" (the "state-created danger exception"). *Patel v. Kent School Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011) (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

Plaintiffs argue they have plausibly alleged that both exceptions apply to this case. They assert a special relationship exists between B.D. and the District because she is a special needs student. Plaintiffs also claim the state-created danger exception applies because the District placed B.D. "in harm's way" by ignoring her claims that other students wanted to attack her, as well as failing to prevent the incident in which Principal Winters tackled her. (Doc. 23 at 11.) Defendants argue that, as a matter of law, *Patel* forecloses Plaintiffs' reliance on the special relationship exception. (Doc. 18 at 3-4.) With respect to the state-created danger exception, they argue that Plaintiffs fail to allege any affirmative conduct on the part of the District that placed B.D. in danger. (Doc. 24 at 1-4.)

**A. Special Relationship Exception**

The special relationship exception applies when the state holds a person in custody and limits her freedom, such as during "incarceration, institutionalization, or other similar restraint of personal liberty." *DeShaney*, 489 U.S. at 200. "When a person is placed in these types of custody, [courts] allow due process claims against the state for a fairly simple reason: a state cannot restrain a person's liberty without also assuming some responsibility for the person's safety and well-being." *Patel*, 648 F.3d at 972.

Plaintiffs argue the exception exists between a special needs student and a school district. (Doc. 23 at 12.) But this argument was rejected by the Ninth Circuit in *Patel*. In *Patel*, the parents of A.H., a developmentally disabled student, brought suit against the

1    school district and the principal after A.H. was discovered to have engaged in sexual
2    relations with another student in the school bathroom. 648 F.3d at 970. The parents
3    argued that A.H. was in the custody of the state while at school because attendance was
4    mandatory under state law. *Id.* at 972. They also relied on the state's *in loco parentis*
5    doctrine, which required schools to protect students from reasonably foreseeable dangers.
6    *Id.* at 972-73.

7    The court concluded that mandatory school attendance, coupled with the schools'
8    *in loco parentis* obligations under state tort law, does not restrain freedom in the same
9    sense as incarceration or institutionalization. *Id.* at 974. A.H. was not being held against
10   her will. She did not live at school, and at any point in time, A.H.'s parents could have
11   removed her from school or decided to homeschool her. *Id.* Every night, A.H. went
12   home and returned to her parents' custody. *Id.* at 973. Unlike incarceration or
13   institutionalization, the school district did not restrain A.H.'s liberty so as to render her
14   parents "unable to care for her." *Id.* at 974 (internal quotation marks and alterations
15   omitted).

16   With particular relevance to the instant case, the court noted that "[a] tailored
17   educational program for a disabled student" does not confer special relationship status.
18   *Id.* Such "enhanced supervision did not prevent [the parents] from caring for A.H.'s
19   basic needs," and the parents "always remained A.H.'s primary caretaker." *Id.* The
20   result here is no different. B.D.'s parents could have removed her from Cartwright
21   School District at any time, and they did so in July 2014. There are no allegations that
22   B.D. was held at school against her will or, more importantly, that her parents were
23   unable to care for her. She returned to the custody of her parents each day after school.
24   Consequently, as a matter of law, B.D.'s status as a special needs student does not impose
25   a constitutional duty upon the District to protect B.D. from harm by third parties, and
26   Plaintiffs' claim fails in this regard.[1]

27
28   _____
     [1] Plaintiffs cite *Kuahako v. State of Hawaii Board of Education Department of Education*, No. 13-00567 DKW-BMK, 2015 WL 470230 (D. Haw. Feb. 3, 2015), for the proposition that a special relationship exists between a school and special needs student.

- 5 -

### B. State-Created Danger Exception

The state-created danger exception applies when two conditions are satisfied: (1) the state engages in affirmative conduct that places the plaintiff in danger, and (2) the state acts with "deliberate indifference" to a danger that is "known or obvious." *Patel*, 648 F.3d at 974 (citations omitted). "The affirmative conduct sufficient for a state-created danger claims requires an action that affirmatively places the plaintiff in a position of danger." *Doe v. Round Valley Unified School Dist.*, 873 F. Supp. 2d 1124, 1132 (D. Ariz. 2012). It is not enough that a state actor "allows a dangerous situation to develop or continue without intervention – even if the official affirmatively chooses not to intervene." *Id.* at 1133 (citing *O'Dell v. Casa Grande Elementary School Dist. No. 4*, No. CV-08-0240-PHX-GMS, 2008 WL 5215329, at *6-7 (D. Ariz. June 7, 2008)).

Plaintiffs' allegations regarding this exception stem from an incident that occurred on April 22, 2014. While outside before school, B.D. was being bullied and harassed by fellow students. (Doc. 16, ¶¶ 130-139.) B.D. made her way into the building and reported the bullying to a teacher. (*Id.*, ¶ 140.) She was then escorted to Officer Sue's office where she reported that "a whole gang of [students] . . . were plotting against her." (*Id.*, ¶ 142.) Officer Sue assured B.D. that nothing was going to happen. (*Id.*, ¶ 143.) B.D.'s mother found out about the incident and called the school, but Officer Sue told her that "everybody had cooled down." (*Id.*, ¶¶ 145-48.) At lunch, B.D. noticed the same group of students "waiting at the gate for her." (*Id.*, ¶ 149.) She proceeded to the school office, but was told to "get out of the building" by a staff person. (*Id.*, ¶ 150.) When she went back outside, a fight broke out between B.D. and another student, identified as "H2." (*Id.*, ¶¶ 155-160.) B.D. threw a punch at H2 and missed, and H2 "grabbed B.D.'s hair and smashed B.D.'s face into the ground." (*Id.*, ¶¶ 159-160.) At that point, Principal Winters ran over and H2 "got off of B.D." (*Id.*, ¶ 161.) B.D. then "ran up to H2 and

---

(Doc. 23 at 12.) But *Kuahako* did not analyze the special relationship exception in the context of a § 1983 substantive due process claim. It concluded that a special relationship existed between a special needs victim and a private landowner in the context of premises liability. *Id.* at *6. *Kuahako* is inapposite.

punched her." (*Id.*)  Principal Winters then "ran full force at B.D., knocking her to the ground in a tackle, landing on top of her and confining her arms." (*Id.*, ¶ 162.)

The court in *O'Dell* dealt with a situation similar to the instant case. In that case, the plaintiff's seventh grade daughter, Serena Diaz, was verbally and physically threatened by a fellow student, Raeven Perez. 2008 WL 5215329, at *1. The plaintiff notified the school district, the school resource officer, and the school principal of the threats. *Id.* On one particular occasion, the plaintiff received a call from one of Diaz's teachers regarding a rumor that Diaz was going to be attacked by Perez. *Id.* Even after the vice principal intervened and spoke to Perez, Perez assaulted Diaz during a class break. *Id.* The plaintiff brought a § 1983 action against the school district and the principal alleging a violation of Diaz's liberty interest in attending school without threat of harassment, violence, or bodily injury. *Id.* at *2. The plaintiff argued that the defendants "were deliberately indifferent to the danger they created or exacerbated when they allowed Perez to remain in school and returned [Diaz] to her class [the day of the assault]." *Id.* at *5 (alterations in original).

The court noted that the "critical inquiry . . . is whether [the vice principal] '*affirmatively created* an actual, particularized danger [that the plaintiff] would not otherwise have faced.'" *Id.* at 6 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006) (alterations and emphasis in original)). It found that the decision of the vice principal to return Diaz to her class "did not render her more vulnerable to a danger that she otherwise would not have faced." *Id.* Thus, the plaintiff's claim that the defendants affirmatively placed Diaz in danger simply by returning her to class was implausible, and the exception did not apply. *Id.*

Like *O'Dell*, Plaintiffs' allegations do not plausibly suggest that Defendants left B.D. in a more dangerous situation than the one in which they found her by not allowing her inside the building at lunch. *See Kennedy*, 439 F.3d at 1062 ("In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not

1  have been available to the individual.  Instead, we examine whether the officer[ ] left the
2  person in a situation that was more dangerous than the one in which they found [her]."
3  (quoting *Munger v. City of Glasgow*, 227 F.3d 1082, 1086 (9th Cir. 2000))).  In other
4  words, the decision of the staffer to order B.D. out of the building "did not render her
5  more vulnerable to a danger that she otherwise would not have faced." *O'Dell*, 2008 WL
6  5215329, at *6.  The threat of bodily harm or imminent bullying was created by the group
7  of students, not Defendants.  B.D. faced this danger whether she was inside the school or
8  outside of the school.  Though it may have been more prudent for the front office staffer
9  to permit B.D. to remain in the building during lunch, an affirmative choice not to
10 intervene is insufficient, *see Doe*, 873 F. Supp. 2d at 1033 (no affirmative act where
11 government "affirmatively chooses not to intervene"), and Plaintiffs do not allege that the
12 front office staffer had any knowledge of the alleged danger posed by the group of
13 students.  These allegations fall short of establishing that the state-created danger
14 exception applies to this case.

15        Moreover, the alleged conduct of Defendants is unlike cases in which courts have
16 found the requisite affirmative conduct.  For example, in *Kennedy*, the Kennedys reported
17 to the police that their neighbor, Michael Burns, had molested their nine-year old
18 daughter. 439 F.3d at 1057.  Because of Burns' unstable and violent nature, the
19 responding officer promised the Kennedys that he would notify them before contacting
20 Burns about the allegations of molestation.  *Id.* at 1058.  At one point during the
21 investigation, the Kennedys learned of further violent incidents involving Burns, and
22 called the officer to express a concern for their safety.  *Id.*  Nonetheless, the officer later
23 drove to Burns' house and informed him of the Kennedy's allegations.  *Id.*  The officer
24 then drove to the Kennedy's house and told them of his conversation with Burns.  *Id.*
25 The Kennedys became upset, but the officer assured them that police would patrol the
26 area around both the Kennedy's and Burns' houses.  *Id.*  That same night, Burns broke
27 into the Kennedys' house, killed Jay Kennedy, and wounded Kimberly Kennedy while
28 they slept.  *Id.*  It was later discovered that no such patrols took place.  *Id.*  The Court

1   found that the officer affirmatively created an actual, particularized danger to the
2   Kennedys that they otherwise would not have faced by informing Burns of their
3   allegations. *Id.* at 1063. Without the officer's conduct, Burns would not have known of
4   the allegations, and likely would not have shot the Kennedys. As such, the state officer's
5   actions were sufficient to satisfy the affirmative conduct prong of the state-created danger
6   exception. Here, Plaintiffs allege no such conduct on the part of Defendants.
7   Accordingly, Plaintiffs fail to plausibly allege Defendants affirmatively placed B.D. in a
8   situation of danger.

9   Furthermore, to the extent that Plaintiffs generally allege that Defendants
10  affirmatively placed B.D. in danger by failing to prevent the bullying and harassment
11  B.D. allegedly suffered, the Court finds this argument is precluded by *DeShaney*— which
12  stressed that a "State's failure to protect an individual against private violence simply
13  does not constitute a violation of the Due Process Clause." 489 U.S. at 197. Here,
14  Plaintiffs' allegations that Defendants permitted a dangerous situation to develop or
15  continue does not satisfy the "affirmative act" requirement of the state-created danger
16  exception. *See Doe*, 873 F. Supp. 2d at 1133.

17  In addition, even if Plaintiffs plausibly alleged affirmative conduct placing B.D. in
18  danger, the allegations fail to demonstrate deliberate indifference. Plaintiffs assert
19  Principal Winters' tackling of B.D. was deliberately indifferent to the "danger of tackling
20  a child." But Principal Winters' conduct is not an alleged failure to act, *i.e.*, his alleged
21  conduct does not suggest that he stood by and watched as B.D. suffered physical injury.
22  Rather, Plaintiffs allege that he ran over to the scene in an apparent attempt to break up
23  the fight. At this moment, H2 got off of B.D., but then B.D. ran over and continued the
24  fight by punching H2. It was at this point that Principal Winters tackled B.D. to the
25  ground. These allegations do not plausibly suggest deliberate indifference on the part of
26  Principal Winters. At most, Plaintiffs have stated a prima face case for battery, not a
27  deprivation of a constitutional right. *See DeShaney*, 489 U.S. at 202 ("[T]he Fourteenth
28  Amendment . . . does not transform every tort committed by a state actor into a

constitutional violation.").

Plaintiffs also argue that the front office staffer's decision to order B.D. out of the building demonstrates Defendants' deliberate indifference. But, as noted above, there is no allegation that the front office staffer knew about the alleged danger. And Plaintiffs do not argue that Defendants' knowledge of the bullying may be imputed to the staffer.

### C. Conclusion

Plaintiffs fail to plausibly allege that either the special relationship or state-created danger exceptions apply to this case. Consequently, their § 1983 claim is dismissed.

## II. Retaliation Claims

Plaintiffs also bring claims for retaliation under the ADA and the Rehabilitation Act. They allege that Defendants' mistreatment of B.D. "escalated" after the April 22, 2013 OCR complaint and subsequent investigation. (Doc. 16, ¶¶ 212-13.) Plaintiffs point to three instances of retaliation: (1) the front office staffer ordering B.D. out of the office, (2) Principal Winters tackling B.D., and (3) Defendants escalating their mistreatment of B.D. (Doc. 23 at 7, 11.) Defendants argue that Plaintiffs fail to state a plausible claim for retaliation because they rely on conclusory allegations, and the complaint does not connect B.D.'s disability to Defendants' alleged retaliatory conduct. (Doc. 18 at 6-7.) The Court agrees.

Both the ADA and the Rehabilitation Act contain provisions prohibiting retaliation against non-disabled persons who advocate for the rights of those who are disabled. *See* 28 C.F.R. § 35.134; 34 C.F.R. § 100.7(e). "Retaliation claims, whether brought pursuant to the ADA or Section 504, are analyzed under the same standard." *Lee v. Natomas Unified School Dist.*, 93 F. Supp. 3d 1160, 1167 (E.D. Cal. 2015) (citing *Douglas v. Cal. Dep't of Youth Auth.*, 285 F.3d 1226, 1229 n.3 (9th Cir. 2002)). To prevail on a claim for retaliation, a plaintiff must show: (1) she engaged in a protected activity, (2) the defendant knew about the protected activity, (3) an adverse action was taken against her, and (4) a causal connection exists between the protected activity and the adverse action. *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 849 (9th Cir. 2004).

### A. B.D.'s Disability

Plaintiffs do not expressly allege that B.D. is disabled within the meaning of the ADA. They do, however, allege that that she is a "special needs student with an Individualized Education Plan," (Doc. 16, ¶ 9.) For purposes of this Order, the Court assumes, but does not find, this condition is a "disability" within the meaning of the ADA. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 n.2 (9th Cir. 1996).

### B. Protected Activity

Plaintiffs allege that they engaged in protected activity when they complained about Defendants' discrimination of B.D. based on disability in the April 22, 2013 OCR complaint. (*Id.*, ¶ 95.) "Advocating for disabled students on issues related to their federal and state education rights is a protected activity." *Lee*, 93 F. Supp. 3d at 1168; *see also* 42 U.S.C. § 12203(a)-(b). However, Plaintiffs fail to connect B.D.'s disability to any of the alleged bullying by peers or mistreatment at the hands of Defendants. Similar allegations were addressed in *Eskenazi-McGibney v. Connetquot Central School District* 84 F. Supp. 3d 221 (E.D.N.Y. 2015). There, the plaintiffs alleged that their child was bullied by fellow students and a bus driver. *Id.* at 232. They asserted that school officials failed to intervene and retaliated against the child when the parents complained. *Id.* at 233-34. However, the court concluded that the complaint was "devoid of any allegation that the bullying was based on [the child's] disability." *Id.* at 232. The court noted that "simply because a disabled person was bullied does not, without more, compel the conclusion that the bullying was 'based on [the child's] disability.'" *Id.* (citation omitted). Thus, the retaliation claim failed because the plaintiffs "did not complain that the bullying was on account of [the child's] disability." *Id.* at 233.

The result is no different here. Nowhere in the complaint do Plaintiffs directly allege that Defendants' mistreatment of B.D. was due to her disability. Nor does a thorough reading of the allegations permit an inference that Defendants mistreated B.D., either through indifference to her needs or via affirmative conduct, because of her status as a special needs student. Further, there are no allegations that the students were

bullying B.D. because of her disability. Although Plaintiffs' 2013 OCR complaint charged discrimination based on disability, sex, and race, (Doc. 16, ¶ 95(1) & (2)), two conclusory allegations are insufficient to plausibly suggest Defendants or the students were motived by B.D.'s disability. And the 2013 OCR complaint, which is attached to Plaintiffs' complaint, never mentions that B.D. was being bullied or mistreated by Defendants because of her disability. (Doc. 16-1 at 12-14.) Indeed, there are no allegations of name-calling related to her disability. The name-calling consists of racially-charged phrases like "white trash" and "white shit," as well as insults like "fat ass" and "whore." (*Id.* at 13.) Without any supporting factual allegations, either in the amended complaint or the 2013 OCR complaint, the Court cannot conclude Plaintiffs engaged in protected activity because they did not complain that the bullying or mistreatment by Defendants was because of B.D.'s disability. *See Eskenazi-McGibney*, 84 F. Supp. 3d at 234.

### C. Knowledge

Even if Plaintiffs engaged in protected activity, they fail to directly allege that Officer Sue, Principal Winters, or any other school employee, had knowledge of Plaintiffs' protected activity. Although the Court may infer Principal Winters and Officer Sue's knowledge of Plaintiffs' protected activity because both parties were named in the April 22, 2013 OCR complaint, (*See* Doc. 16-1 at 12-14), the same inference cannot be made about the front office staffer who allegedly ordered B.D. out of the building on April 22, 2014. This is fatal to B.D.'s claim that she suffered an adverse action by the front officer staffer because, without knowledge of the protected activity, the staffer could not have retaliated against B.D. for the OCR complaint.

### D. Adverse Action

In addition, Plaintiffs plausibly allege only one adverse action. An action is considered adverse "if it is reasonably likely to deter [people] from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that

produces" such "an injury or harm" that it would deter reasonable people from opposing the defendant's conduct. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Plaintiffs' allegation that Principal Winters tackled B.D. certainly falls within an action that would deter a reasonable person from continuing to engage in protected activity. However, the allegation that Defendants' mistreatment of B.D. escalated after Plaintiffs filed the April 22, 2013 OCR complaint fails. The complaint merely states: "Thereafter, the District's and Officer Sue's mistreatment of B.D. escalated." (Doc. 16, ¶¶ 213, 219.) But Plaintiffs fail to describe how the alleged mistreatment worsened after they filed the complaint. There are no supporting factual allegations. In fact, the complaint is devoid of any alleged mistreatment for nearly ten months after Plaintiffs engaged in the alleged protected activity. The allegations of "escalated" mistreatment are conclusory and vague, and thus are not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 680. Thus, the only adverse action at issue is Principal Winters' decision to tackle B.D. on April 22, 2014.

### E. Causation

Plaintiffs claim Principal Winters tackled B.D. during the April 22, 2014 fight because he knew about the Plaintiffs' protected activity. (Doc. 23 at 6-7.) However, Plaintiffs' own allegations undermine their argument. According to the amended complaint, H2 and B.D. were in the midst of a violent altercation as Principal Winters approached. (Doc. 16, ¶¶ 155-60.) It was not until after H2 got off of B.D., and B.D. "ran up to H2 and punched her," that Principal Winters knocked B.D. down and restrained her arms. (*Id.*, ¶¶ 161-62.) Based on these allegations, it is simply implausible that Principal Winters was harboring retaliatory motive while responding to the violent confrontation. Instead, the allegations give rise to the inference that he made a split second decision to stop a fight.

Furthermore, this incident took place exactly a year after Plaintiffs' alleged protected activity. In *Villiarimo v. Aloha Island Air, Inc.*, the court explicitly stated that "timing alone will not show causation in all cases" and to infer a retaliatory motive the

adverse action must occur "fairly soon after the… protected expression." 281 F.3d 1054, 1065 (9th Cir. 2002). The court held that eighteen months was "simply too long, by itself, to give rise to an inference of causation." *Id.* Similarly here, the twelve month interval between Plaintiffs' OCR complaint and Principal Winters' tackling of B.D. is simply too long to infer causation.

In response, Plaintiffs raise a new theory of retaliation in their brief: Defendants retaliated against B.D. after they received notice from the OCR that the District's policies did not satisfy the resolution agreement on March 20, 2014. (Doc. 23 at 6-7.) This suggests a closer proximity between the protected activity and the adverse action. However, Plaintiffs did not participate in the March 20, 2014 notice—it was the result of unilateral action of the OCR. The notice, therefore, cannot constitute protected activity. Furthermore, there is no allegation that Principal Winters knew about the notice, and it is not plausible that he retaliated against B.D. by tackling her.

### F. Conclusion

Plaintiffs fail to plausibly allege the necessary elements of their retaliation claims. Consequently, the claims are dismissed.

**IT IS ORDERED** that Defendants' motion to dismiss, (Doc. 18), is **GRANTED**. Counts one, two, and three of Plaintiffs' amended complaint are dismissed, leaving only state law counts. Consequently, within 14 days of the date of this Order, Plaintiffs must submit a brief showing cause why this case should not be dismissed for lack of subject matter jurisdiction. Specifically, are there any barriers to Plaintiffs refiling their state claims in state court? The brief shall be no longer than 10 pages and must comply with the formatting requirements set forth in LRCiv. 7.1.

Dated this 25th day of March, 2016.

Douglas L. Rayes
United States District Judge